UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PCA MINERALS LLC,

        Plaintiff,

                            Case No. 1:13-cv-1243

v.                                 Hon. Hugh W. Brenneman, Jr.

MERIT ENERGY COMPANY, LLC,

        Defendant.

_____/

## OPINION

On October 8, 2013, plaintiff PCA Minerals LLC ("PCA") filed a complaint in the Manistee County Circuit Court for declaratory judgment and other relief against defendant Merit Energy Company, LLC ("Merit Energy") regarding PCA's rights to share in the production of oil and gas from certain property in Manistee County, Michigan, that has been included in unitized and pooled areas that have been, and are, producing oil, gas and other hydrocarbons. Compl. (docket no. 1-1). Merit Energy removed the action to this Court based upon diversity jurisdiction. *See* Amended Notice of Removal (docket nos. 1 and 8); 28 U.S.C. § 1332. This matter is now before the Court on PCA's "Motion for partial summary judgment regarding PCA's interest in the lands" (docket no. 73), PCA's "Motion for partial summary judgment regarding the extinguishment of defendant's lease covering PCA's lands" (docket no. 74), PCA's "Motion for partial summary judgment regarding the applicable statute of limitations that applies to PCA's claims" (docket no. 75), and Merit Energy's "Motion, pursuant to Fed. R. Civ. P. 56, for summary judgment against plaintiff PCA Minerals LLC" (docket no. 77).

## I.      PCA's claims

### A.      Overview

In its complaint, PCA alleged that it is entitled to a share of the production from two separate tracts in the unitized and pooled areas that Merit Energy operates. Compl. at ¶ 1. At the heart of PCA's claim is that a certain conveyance dated January 11, 1955 (sometimes referred to herein as the "Belcher Deed") created a 50-year fixed term interest in the oil, gas and other minerals which expired on January 10, 2005. *Id.* at ¶ 21. PCA alleged that its right to share in the production accrued on January 11, 2005, but that Merit Energy has not accounted for, calculated or paid PCA its share of the production. *Id.* at ¶ 1. Specifically, PCA alleged that it has been the rightful owner of oil, gas and minerals in the property since January 11, 2005, that it has a .289315 interest in the yearly production of the Manistee 24 Unit, which produced 168,520 Mcf [1] of gas "from January 2005 through early summer 2013", and that it has a .50 interest in the yearly production of Bahr Unit, which produced 196,660 McF of gas and 50,145 barrels of oil during that same time period. *Id.* at ¶¶ 27, 45-47.

### B.      PCA's ownership interest

This lawsuit involves the ownership of certain mineral rights in certain real estate (the "property") located in Manistee County, Michigan, described as follows:

> The South Half (S 1/2) of Southwest Quarter (SW 1/4) excepting and reserving a strip one rod wide along the East side thereof for highway, and the Northwest Quarter (NW 1/4) of Southeast Quarter (SE 1/4) of Section Twenty-four (24), Township Twenty-two North (22), Range Sixteen West (16), containing in all one hundred nineteen & 23/100 (119.23) acres more or less.

---

[1] "Mcf refers to 1,000 cubic feet of natural gas" *In re Review of Consumers Energy Co. Renewable Energy Plan*, 293 Mich.App. 254, 261, n. 6, 820 N.W.2d 170 (2011).

In a warranty deed dated January 11, 1955, recorded January 24, 1955 in Liber 176, Page 470, Roy S. Belcher and Susye L. Belcher, husband and wife, as grantors, conveyed the property to the North American Timber Company, a Michigan Corporation,

> Excepting and reserving unto the said grantors exclusive rights to all oil, gas and mineral rights in and under the foregoing described premises for a period of fifty (50) years after the execution of this deed, together with the right of ingress and egress thereon and the use of the surface of said real estate as may be reasonably necessary for the development and production of such oil, gas and minerals.

Belcher Deed (docket no. 73-3 at p. ID# 635).[2]  Neither party disputes that Roy S. Belcher owned the mineral rights to the property when he executed this deed on January 11, 1955.[3]

In Agreement of Merger dated June 24, 1963, North American Timber Company merged into and became Packaging Corporation of America.  *See* Agreement of Merger, recorded in Liber 248, Page 241 (docket no. 73-8).

In a deed dated June 8, 1965, recorded  June 14, 1965, in Liber 264, Page 83, Packaging Corporation of America conveyed to PKG Corporation the "[s]urface and remainder interest in oil, gas and minerals in and to the S1/2  SW1/4; NW1/4 SE1/4 of Section 24, Township 22 North, Range 16 West, being lands conveyed by Deed dated 1-11-55 and recorded in Liber 176, Page 470." *See* Deed (docket no. 83-8 at pp. ID## 1536-37, 1553).  However, this deed contained errors with respect to the names of the grantor and grantee, and a corrective quit claim deed was recorded in 1967 to confirm that the grantee, the former PKG, was now known as Packaging

---

[2] The deeds, leases, agreements and other documents related to the property were recorded in the Office of the Manistee County Register of Deeds.

[3] The record reflects that George W. Swigart and his wife Amy Swigart conveyed the property to "Roy Swan Belcher" in a warranty deed from, dated June 13, 1917, recorded July 21, 1917 in Liber 66, Page 91.  *See* Swigart Deed (docket no. 73-7).  Neither party contends that Roy Swan Belcher was a different person than Roy S. Belcher.

Corporation of America.[4]  *See Diehlman v. Dwelling - House Ins. Co.*, 78 Mich. 141, 43 NW 1045 (1889) (corrective deed permitted to have retroactive effect to remedy a faulty description of the real property).

In 1989 and 1992, Packaging Corporation of America conveyed portions of the surface estate of the property.  Each of the deeds reserved the grantor's interest in oil, gas and other hydrocarbons.  *See* Warranty Deed, recorded in Liber 518, Page 449 (docket no. 73-12 at pp. ID## 717-18); Warranty Deed, recorded in Liber 561, Page 258 (docket no. 73-12 at pp. ID## 719-20); Warranty Deed, recorded in Liber 570, Page 28 (docket no. 73-12 at pp. ID## 721-22).

In a Notice of Intention to Retain Mineral rights, dated March 31, 1992, filed April 22, 1992 in Liber 557, Page 799,  Packaging Corporation of America identified itself as "the owner of the oil, gas and minerals" on several tracts, including the following lands in Section 24, T 22

---

[4] The corrective quit claim deed, dated March 1, 1966, recorded  May 31, 1967 in Liber 274, Page 918, recited in pertinent part:

> That Packorp. Inc. (whose name was changed from Packaging Corporation of America by amendment of its Articles of Incorporation on June 8, 1965), a Delaware corporation, party of the first part  .  .  .  does hereby convey and quit claim unto Packaging Corporation of America (whose name was changed from PKG Corporation by amendment of its Articles of Incorporation on June 8, 1965), a Delaware corporation with its principal office at 1632 Chicago Avenue, Evanston, Illinois, party of the second part, all those tracts and parcels of land situated in Manistee County, Michigan, and described in Exhibit "A" attached hereto [.]

Quit Claim Deed (docket no. 73-11 at p. ID# 710).  The quit claim deed further recited that it was a corrective deed "merely for the purpose of correcting typographical errors, omissions, and/or mistakes and/or erroneous or misleading descriptions in that certain deed dated June 8, 1965 between the same grantor and grantee which was recorded on June 14, 1965 in the Manistee County Register of Deeds Office in  Liber 264 on Page 83 et seq."  *Id.* at pp. ID## 710-11.  The quitclaim deed conveyed to the former PKG, now known as Packaging Corporation of America, the "[s]urface and remainder interest in oil, gas and minerals in and to the South Half of the Southwest Quarter and the Northwest Quarter of the Southeast Quarter, being lands conveyed by Deed dated January 11, 1955, recorded in Liber 176 on Page 470."  *Id.* at p. ID# 715.

4

North, R 16 W: "S1/2 SW1/4  EXC a strip 1 rod wide along the East side thereof for hwy; NW1/4 SE1/4."  *See* Notice of Intention (docket no. 73-13).

On November 2, 1995, Packaging Corporation of America filed a Certificate of Amendment, changing its name to "Tenneco Packaging Inc."  *See* Delaware Secretary of State filing, Liber 727 Page 362 (docket no. 73-14).

In a Quit Claim Mineral Deed dated September 29, 1997, recorded in Liber 660, Page 483,  Tenneco Packaging, Inc. conveyed to Martin-Marks I L.L.C., "all of the interest of the Grantor, if any, in the minerals on, in and under and that may be produced in the Counties of .  .  . MANISTEE .  .  . including, without limitation, the land described on Exhibit A attached hereto. .  . including, without limitation, all oil, gas and other hydrocarbon substances  .  . ." *See* Quit Claim Mineral Deed (docket no. 73-15) (emphasis in original).  The real estate described in Exhibit A included the following lands in Section 24, T 22 North, R 16 W: "S1/2 SW1/4  EXC a strip 1 rod wide along the East side thereof for hwy; NW1/4 SE1/4."  *Id.* at p. ID# 734.

Martin-Marks I, L.L.C. changed its name to "PCA Minerals LLC" effective August 17, 2011. *See* Amendment to the Articles of Organization of Martin-Marks I, L.L.C. (docket no. 73-16 at p. ID# 740).

## C.    Development of the property

On September 22, 1972, Roy S. Belcher, a single person, executed an oil, gas and mineral lease in favor of Shell Oil Company, which was recorded in Liber 310, Page 548, and which granted a lease on the following property located in Manistee County, Michigan:

TOWNSHIP 22 NORTH, RANGE 16 WEST

SECTION 24: S1/2 of SW1/4 and NW Frl 1/4 of SE Frl 1/4 (limited
to whatever interest lessor may have in said property)

5

Belcher Lease (docket no. 73-17 at p. ID# 744).

Paragraph 2 of the lease included a primary term of five years:

Unless sooner terminated or no longer kept in force under other provisions
hereof, this lease shall remain in force for a term of five (5) years from the date
hereof, hereinafter called "primary term", and so long thereafter as operations, as
hereinafter defined, are conducted upon said land with no cessation for more than
ninety (90) consecutive days.

*Id.*   Under the lease, the Shell Oil Company agreed to pay Belcher a royalty equal to one-eighth

(1/8th) part of all oil produced and saved by the lessee from the property.  *Id.* at ¶ 3.

In its complaint, PCA alleged a chronology of the development of the oil and gas

rights excepted and reserved in the Belcher Deed.  In this chronology, PCA refers to the property

as "the Lands."  Merit does not contest this chronology, having admitted these allegations in its

answer. *See* Answer at ¶¶ 28-41 (docket no. 7).  These admitted facts are no longer at issue[5]:

28.   As for the oil and gas development of the Lands, as noted, Belcher executed
the Lease with, Shell Oil Company on September 22, 1972. Exhibit 6. Shell Oil
Company initially drilled a natural gas well, the State Manistee & Ryder 1-24,
located at the center of the E/2 of the SW/4, encompassing a portion of the Lands
(the "St. Ryder 1-24").  The St. Ryder 1-24 was drilled on an eighty- acre permitted
well spacing unit consisting of the E/2 SW/4, Section 24, T22N, RI6W.  *See* Ryder
1-24 Permit to Drill, Exhibit 16.

29.   The eighty-acre acre [sic] production unit upon which the Ryder 1-24 was
drilled was expanded to encompass additional acreage via a Pooling Agreement
dated May 5, 1977.  The Pooling Agreement included that portion of the Lands

_____

[5] *See Keller v. United States*, 58 F.3d 1194, 1199 at n. 8 (7th Cir.1995) (judicial admissions are formal
concessions in the pleadings by a party or its counsel that are binding on the party making them; they are
conclusive and may not be converted at trial); *Ferguson v. Neighborhood Housing Services of Cleveland,
Inc.*, 780 F.2d 549, 550-51 (6th Cir. 1986) ("Judicial admissions eliminate the need for evidence on the
subject matter of the admission, as admitted facts are no longer at issue") (internal quotation marks omitted);
*Bellefonte Re Insurance Company v. Argonaut Insurance Company*, 757 F.2d 523, 528-29 (2d Cir. 1985)
("[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout
the course of the proceeding").  Thus, it has been said that "[a] judicial admission trumps evidence," giving
rise to the principle that "a plaintiff can plead himself out of court."  *Murrey v. United States*, 73 F.3d 1448,
1455 (7th Cir.1996).

described as Section 24, S/2 SW/4, containing 80 acres. *See* Pooling Agreement, Liber 356 Page 629, Exhibit 17. Under the Pooling Agreement, all unitized substances produced were allocated to each tract that comprised the Unit Area in proportion to the acreage contained in that tract. *Id.* As explained below, this acreage was eventually included in what is now known as the Manistee 24 Unit.

30.     In February of 1976, Shell Oil Company drilled a well located at the SE/4 SW/4 of the NE/4, Section 24, T22N, RI6W, the Bahr et al. 4-24 (the "Bahr Well"). The Bahr Well was completed on an eighty-acre permitted well spacing unit consisting of the SW/4 NE/4 and NW/4 SE/4 of Section 24, T22N-RI6W (the "Bahr Unit"). A Declaration of Pooling dated January 26, 1978 established the Unit, and specifically references the Lease. Moreover, the well spacing unit includes a portion of the Lands, the NW/4 SE/4 of Section 24, T22N-RI6W. *See* Declaration of Pool, Liber 361 Page 795, Exhibit 18.

31.     Shell Oil Company also drilled other wells in and around the vicinity of the Lands. Those wells included the State Manistee 2-23, completed in January of 1979 and located in Section 23, T22N-RI6W (the "St. Manistee 2-23"); the Packaging Corporation of America & Gillespie 5-23A, completed in March of 1980 and located in Section 23, T22N-R 16W(the "Gillespie 5-23A"); and the State Manistee 1-25, completed in August of 1984 and located in Section 25, T22N-R.16W (the "St. Manistee 1-25"). As explained below, these wells were also included in what is known as the Manistee 24 Unit.

32.     On January 20,1984, Shell Oil Company conveyed to Shell Western E&P, Inc. ("SWEPI") all of Shell Oil Company's right, title, interest, and obligations in, to, under, and arising out of the Lease. *See* Conveyance and Assignment, Liber 435 Page 317, Exhibit 19.

33.     On April 1, 1991, SWEPI created a Plan of Unitization for the Manistee 24 Unit. The Manistee 24 Unit consists of four separate tracts. Tract No. I covers the SW/4, Section 24, T22NR16W and encompasses the St. Ryder 1-24 well. Tract No. 2 covers the E/2 SE/4, Section 23, T22N-RI6W and encompasses the St. Manistee 3-23. Tract No. 3 covers the W/2 SE/4, Section 23, T22N-RI6W and encompasses the Gillespie 5-23A. Tract No.4 covers the NW/4 NW/4, Section 25, and NE/4 NE/4, Section 26, and encompasses the St. Manistee 1-25. *See* Plan of Unitization, Exhibit 20. Exhibit B of the Plan of Unitization contains a Tract Map that outlines the four tracts and indicates the location of the four wells included within the Unit Area. *Id.*

34.     Under the Plan of Unitization, all oil and gas rights of royalty owners and of lessees were unitized so that the Unit Operations could be conducted as if the Unit Area had been included in a single lease executed by all royalty owners. *See* Plan of Unitization, Exhibit 20, Article 3. Moreover, operations conducted on any part

of the Unit Area, or production from any part of the Unitized Formation, were considered as like operations upon or production from each Tract. *Id.*

35.     Under the Plan of Unitization, each Tract was allocated a certain percentage of the Unit Production. All Unit Production is allocated to the several Tracts in accordance with each Tracts' respective Tract Participation in effect during the time the Unit is produced. The Tract Participation for each Tract in the Unit is established in the Plan of Unitization. *See* Article 5 and Exhibit C of the Plan of Unitization, Exhibit 20. The Unit Production allocated to each Tract is distributed among and accounted for the persons entitled to share in the production from each Tract.

36.     Under the Plan of Unitization, the St. Ryder 1-24 well was allocated 57.863% (.57863) as its Tract Participation in the Manistee 24 Unit. *Id.*, Exhibit 20.

37.     In 2004, Merit Energy Company was a Delaware corporation authorized to do business in Michigan. *See* Application for Certificate of Authority, Exhibit 21. Upon information and belief, Merit Energy Company succeeded to the interests of SWEPI, including all interests SWEPI had in the Lands and wells included therein, and the Lease. *See e.g.* Exhibit 22, approved Permit Transfer Requests and other information for the St. Ryder 1-24, St. Manistee 3-23, Gillespie 5-23A, St. Manistee 1-25, and the Bahr Well.

38.     Upon information and belief, Merit Energy Company also became the Unit Operator under the Plan of Unitization. The Unit Operator is defined as the Lessee designated to develop and operate the wells existing in the Unit Area acting as Operator and not as a Lessee. *See* Plan of Unitization, Article 1.13, Exhibit 20. Moreover, the Plan of Unitization provides that the Unit, through the Unit Operator, is capable of being sued in its own right. *Id.* at Article 10.1.

39.      Merit Energy Company also succeeded to the interests of SWEPI for those Lands included in the Bahr Unit, was the operator of same, and was the owner/operator of the Bahr Well. *See* Transfer of Permit, Exhibit 22.

40.     In April of 2008, Merit Energy Company surrendered its authority to do business in Michigan. *See* Application for Certificate of Withdrawal, Exhibit 23. However, also in April of 2008, Defendant Merit Energy Company, LLC filed an application to transact business in Michigan, *see* Application for Certificate of Authority to Transact Business in Michigan, Exhibit 24, and also contemporaneously filed a Certificate of Assumed Name indicating "Merit Energy Company" as the assumed name in which Merit would transact business. *See* Certificate of Assumed Name, Exhibit 25.

41.     Merit thus currently holds those interests in the Manistee 24 Unit and Bahr Unit that SWEPI had conveyed to Merit Energy Company. Merit is the Unit

Operator for the Manistee 24 Unit and Bahr Unit, and is the owner and operator of the wells within each Unit.

Compl. at ¶¶ 28-41.

## II.     PCA's causes of action against Merit Energy

### A.     Breach of fiduciary duty (Count I)

In this count, PCA alleged that under the Plan of Unitization for the Manistee 24 Unit, the unit operator  has the exclusive right and is obligated to conduct the unit operations. Compl. at ¶ 52.  *See* Plan of Unitization, Manistee 24 Unit (the "Plan of Unitization") (April 1, 1991), Articles 12.1 and 13.1 (docket no. 83-20 at pp. ID## 1678-79).  Merit Energy, as the current unit operator under the Plan of Unitization, has a fiduciary duty to PCA to account for, apportion, calculate, and pay that share of the unit production that PCA, as a lessee, is due and owing under the Plan of Unitization.  *Id.* at ¶ 53.  Since January 11, 2005, PCA has been entitled to 8/8th of the production attributable to its interests in the Manistee 24 Unit and .289315 of all production of oil and gas from the Manistee 24 Unit.  *Id.* at ¶ 54.  Merit Energy is also the operator of the Bahr Unit. As such, Merit Energy has a fiduciary duty to PCA to account for, apportion, calculate, and pay to PCA its proportionate share of the production from the Bahr Unit.  PCA claims an interest of .50 of all production of oil and/or gas from the Bahr Unit.  *Id.* at ¶ 55.

For both the Manistee 24 Unit and the Bahr Unit, Merit Energy has had a fiduciary duty to account for, apportion, calculate, and distribute that share of production PCA is entitled to since January 11, 2005.  *Id.* at ¶ 56.  However, Merit Energy has not accounted for, apportioned, calculated, or distributed PCA's share of the production from either the Manistee 24 Unit or the Bahr Unit despite the fact that PCA has been and is entitled to proceeds from that production since January 11, 2005.  *Id.* at ¶ 57.  By failing to account for, apportion, calculate, and distribute PCA's

9

share of the production from the Manistee 24 Unit and the Bahr Unit, Merit Energy has breached its fiduciary duties owed to PCA. *Id.* at ¶ 58. For its relief, PCA asks the Court to enter a judgment declaring that Merit Energy has breached its fiduciary duties to PCA and awarding to PCA monetary damages and other relief. *Id.* at p. ID# 21.

### B.     Action for a constructive trust (Count II)

In this count, PCA alleged that as the unit operator for both the Manistee 24 Unit and the Bahr Unit, Merit Energy owes PCA a fiduciary duty that includes the duty to properly account for, apportion, calculate, and distribute that share of the production from both Units that PCA is entitled to. Compl. at ¶ 61. Merit Energy breached its fiduciary duties to PCA by failing to account for, apportion, calculate, and distribute to PCA that share of production PCA is entitled to and that PCA has been entitled to since January 11, 2005. *Id.* at ¶ 62. In addition, by failing to account for, apportion, calculate, and distribute that share of production PCA is entitled to from the Manistee 24 Unit and the Bahr Unit, Merit Energy has been unjustly enriched, and it is unconscionable if it is allowed to retain that share of production that PCA is due and owing. *Id.* at ¶ 63. To prevent Merit Energy from profiting from its wrongful acts, a constructive trust is required as a matter of equity as to PCA's share of the production from both the Manistee 24 Unit and the Bahr Unit from January 11, 2005 through to the present. *Id.* at ¶ 64. For its relief, PCA asks that this Court impose a constructive trust for the entire amount of the production due and owing to PCA from the Manistee 24 Unit and the Bahr Unit from January 11, 2005 to the present. *Id.* at p. ID# 22.

### C.     Action for equitable lien (Count III)

In this count, PCA alleged that to prevent Merit Energy from profiting from its wrongful acts, equity requires that an equitable lien be created as to PCA's share of the production

10

from both the Manistee 24 Unit and the Bahr Unit from January 11, 2005 to the present and going forward.  Compl. at ¶ 69.  For its relief, PCA asks that the Court impose and declare an equitable lien on the future production and revenue from the Manistee 24 Unit and the Bahr Unit, and on any equipment and leases in the Manistee 24 Unit and the Bahr Unit, until such time as PCA is paid in full for its share of the production from the Manistee 24 Unit and the Bahr Unit.  *Id.* at p. ID #23.

### D.      Breach of reasonably prudent operator standard (Count IV)

In this count, PCA alleged that under Michigan law, an oil or gas producer has a duty to act as a reasonable and prudent oil producer in operating the field and in producing the oil or gas. Compl. at ¶ 71.  As of January 11, 2005, PCA became the owner of all oil, gas and mineral interests in the property.  *Id.* at ¶ 73.  Under the Plan of Unitization, and under Michigan law, Merit Energy had the duty, as the unit operator, to conduct unit operations in a good and workmanlike manner as would a prudent operator under the same or similar circumstances.  *Id.* at ¶ 72.; Plan of Unitization, Article 13.2, p. ID# 1679.  As the owner of certain oil, gas, and mineral interests in lands covered by the Manistee 24 Unit and the Bahr Unit, PCA is entitled to a share of the production from both Units.   Compl. at ¶ 74.  As set forth in the Plan of Unitization, Merit Energy must pay to PCA a certain percentage of the total production from the Unit.  *Id.* at ¶ 75.   PCA, as the owner of oil and gas rights to lands within the Unit that is not subject to a lease should have been paid and allocated 8/8th of production attributable to its interests. *Id.*; Plan of Unitization, Article 1.8 at pp. ID## 1665-66.

PCA is entitled to a percentage of all production of oil and gas from both the Manistee 24 Unit (.289315) and the Bahr Unit ( .50), and has been since January 11, 2005.  Compl. at ¶¶ 76-77.  Merit Energy as the operator of both the Manistee 24 Unit and the Bahr Unit, owes a

duty of diligence to PCA reasonably expected of an operator of ordinary prudence.  *Id.* at ¶¶ 78-79. This duty includes the duty to properly calculate, adjust, and pay to PCA its share of the production from the Manistee 24 Unit as required under the Plan of Unitization and to pay PCA its share of production from the Bahr Unit.  *Id.*  By failing to calculate, adjust, and pay PCA its share of the production from the Manistee 24 Unit as set forth in the Plan of Unitization, and its share of production from the Bahr Unit, Merit Energy has breached its duties as a reasonably prudent operator.  *Id.* at ¶¶ 80-81.  For its relief, PCA asks the Court to enter a judgment declaring that Merit Energy has breached its duties as a reasonably prudent operator, that this Court award to PCA a judgment in an amount in excess of $25,000.00.  *Id.* at p. ID# 25.

### E.      Breach of the Plan of Unitization (Count V)

In this count, PCA alleged that as of January 11, 2005, it became the owner of all of the oil, gas and mineral interests in the property and as of that same date, Merit Energy's lease was extinguished.  Compl. at ¶ 84.  PCA, as the owner of the oil, gas, and mineral interests in the property included in the Plan of Unitization is considered a lessee, and is entitled to an allocation of 8/8th of the production attributable to its interests consisting of a seven-eighths (7/8ths) interest in Unitized Substances, and as a Royalty Owner with respect to its remaining one-eighth (1/8th) interest.  *Id.* at ¶ 85.  *See* Plan of Unitization, Article 1.8., pp. ID## 1665-66.[6]

---

[6] "1.8 <u>Lessee(s) or Working Interest Owner(s)</u> may be used interchangeably and means an owner of an interest in Unitized Substances by virtue of a lease, operating agreement, fee title, or otherwise, including a carried interest, which interest, is chargeable with, and obligated to pay or bear, either in cash or out of production or otherwise, all or a portion of the cost of drilling, developing, producing, and operating the Unit Area.  The owner of Oil and Gas Rights that are free of a lease or other instrument conveying the working interest to another shall be regarded as a Lessee to the extent of the seven-eighths (7/8ths) of its interest in Unitized Substances, and as a Royalty Owner with respect to its remaining one-eighth (1/8th) interest therein."

The Plan of Unitization provides that all unit production shall be allocated to the several tracts in accordance with their respective tract participations that were in effect during the time the unit production is produced and sold or removed from the unit area. *Id.* at ¶ 86. *See* Plan of Unitization, Article 5.1, p. ID# 1668. In addition, the amount of unit production allocated to each tract shall be deemed to have been produced from such tract. Compl. at ¶ 86; Plan of Unitization, Article 5.2, p. ID# 1668. The Plan of Unitization also provides that the unit production allocated to each tract shall be distributed among, or accounted for, the persons entitled to share in the production from such tract in the same manner, in the same proportions, and upon the same conditions as they would have participated and shared in the production from such tract, or the proceeds thereof, had the Plan of Unitization not been adopted. Compl. at ¶ 87; Plan of Unitization, Article 5.3, pp. ID## 1668-69. In addition, under the Plan of Unitization, the unit production allocated to each tract is either delivered to those persons entitled to it by virtue of the ownership of oil and gas rights, or sold by the unit operator and the proceeds of the unit production then paid to the person entitled thereto. Compl. at ¶ 88; Plan of Unitization, Article 5.4, p. ID# 1669 and Article 5.5, p. ID# 1669.

For the Manistee 24 Unit, PCA has been and is entitled to its share of the unit production since January 11, 2005 and has been and is entitled to .289315 of all production of oil and gas from the Manistee 24 Unit. Compl. at ¶ 89. The State of Michigan production records from the wells within the Manistee 24 Unit indicate substantial production since January of 2005. Estimates from January 2005 through early 2013 indicate production from the Manistee 24 Unit at 168,520 Mcf of gas. *Id.* at ¶ 90. Although PCA has been and is entitled to a share of the production from the Manistee 24 Unit as a lessee under the plan of unitization, Merit has failed to pay PCA its

share of the unit production. *Id.* at ¶ 91. Merit's failure to pay to PCA its share of the unit production from the Manistee 24 Unit constitutes a breach of the express terms of the Plan of Unitization. *Id.* at ¶ 92. For its relief, PCA asks that the Court enter judgment declaring that Merit Energy has breached the Plan of Unitization, that this Court award to PCA a judgment in an amount in excess of $25,000.00 for Merit Energy's breach of the Plan. *Id.* at p. ID# 27.

### F.    Conversion (Count VI)

In this count, PCA alleged that Merit Energy, by producing oil and gas from the Manistee 24 Unit and the Bahr Unit, both of which include the property in which PCA has exclusive oil, gas, and mineral rights to, has wrongfully exerted control over the oil and gas resources PCA owns. Compl. at ¶ 96. Merit Energy's control over and production from the property constituted and constitutes an act of dominion in denial of or inconsistent with PCA's rights to same and its conversion of PCA's oil and gas resources has occurred continuously since January 11, 2005, is ongoing, and continues to the present day. *Id.* at ¶¶ 97-8. PCA is entitled to the enhanced value of any and all gas and oil produced from the property at the time of Merit Energy's conversion of same plus interest. *Id.* at ¶ 99. Given that the conversion occurred for such an extended period of time, the highest price must be utilized in calculating those proceeds due to PCA for the oil and gas produced from the property in order to ensure PCA receives adequate compensation for the damages suffered. *Id.* For its relief, PCA asks the Court: to enter judgment declaring that Merit Energy has unlawfully converted PCA's property by producing oil and gas resources from the property after January 11, 2005; to enter judgment against Merit Energy for the full value of the oil and gas it wrongfully converted using the highest price for same from the period of January 11, 2005 through

the present, plus interest; and that the Court grant to PCA all of PCA's costs and attorneys fees in bringing this action.  *Id.* at p. ID# 28.

G.      **Unjust enrichment / quantum meruit (Count VII)**

In this count, PCA alleged that Merit Energy has failed and/or refused to pay PCA its share of production from the Manistee 24 Unit and the Bahr Unit that PCA has been entitled to since January 11, 2005.  Compl. at ¶ 102.  As a result of Merit Energy's failure to pay PCA its share of production from these units which PCA is entitled to as the owner of the oil, gas, and mineral rights in the property, Merit Energy has retained and received a benefit at PCA's expense.  *Id.* at ¶ 103.  As a result of Merit Energy's failure to pay PCA its share of production from these units, Merit Energy has been unjustly enriched, and has been so since January 11, 2005.  *Id.* at ¶ 104.  It is inequitable if Merit Energy is permitted to retain PCA's share of the production from the Manistee 24 Unit and the Bahr Unit.  *Id.* at ¶ 105.  For its relief, PCA requests that the Court enter judgment declaring that Merit Energy has been unjustly enriched, that this Court enter a judgment against Merit Energy for the full amount by which it has been unjustly enriched, together with costs, interest and attorney's fees, and that the Court grant such further relief as may be fair and just under the circumstances.  *Id.* at p. ID# 29.

H.      **Declaratory judgment as to royalties / payments**
        **due to PCA (Count VIII)**

In this count, PCA alleged that as of January 11, 2005, it owned the oil, gas, and mineral interest in the property, and thus has interests in, and is entitled to, its share of the production from the Manistee 24 Unit and the Bahr Unit.  *Id.* at ¶ 111.  Merit Energy has not calculated, adjusted, or paid PCA the share of production PCA is entitled to as a result of PCA's interest and rights in either the Manistee 24 Unit (.289315) or the Bahr Unit (.50).  *Id.* at ¶¶ 107-09.

15

For its relief, PCA asks that the Court enter a declaratory judgment: that PCA is entitled to its share of production from the Manistee 24 Unit and the Bahr Unit; that Merit Energy is bound by the Plan of Unitization and the other documents attached hereto; that Merit Energy  has the obligation to calculate, adjust, and pay to PCA that share of the unit production PCA is entitled to for both the Manistee 24 Unit and the Bahr Unit; and that Merit Energy has a continuing obligation to do so for as long as the Plan of Unitization is in effect and for so long as there is production from those wells that are included in the Manistee 24 Unit and the Bahr Unit.  *Id.* at pp ID## 30-31.

## I.        Action for accounting (Count IX)

In  this count, PCA alleged that since January 11, 2005, Merit Energy has failed and/or refused to calculate, adjust, and pay to PCA that share of unit production PCA is entitled to from the Manistee 24 Unit and the Bahr Unit.  Compl. at ¶ 113.

### 1.        Manistee 24 Unit

Under the Plan of Unitization, an owner of oil and gas rights not subject to a lease is to be allocated 8/8th of production attributable to its interests, and is to be regarded as a lessee to the extent of seven-eighths (7/8ths) of its interest in unitized substances, and as a royalty owner with respect to its remaining one-eighth (l/8th) interest therein.  *Id.* at ¶ 114; Plan of Unitization, Article 1.8.  PCA, as an owner of oil and gas rights in land located within the Unit Area that is not subject to a lease is considered a "Lessee" with rights including the right of access to the unit area at all reasonable times to inspect unit operations, all wells, and the records and data pertaining thereto.  Compl. at ¶ 115; Plan of Unitization, Article 1.8 and Article 9.4.1, p. ID# 1671.  Lessees also have the right to receive from the unit operator copies of all reports to any governmental agency, reports of natural gas production and sales and condensate runs and stocks, inventory reports, and all other

information pertaining to unit operations.  Compl. at ¶ 116; Plan of Unitization, Article 9.4.2, p. ID#
1671.  In addition, at the request of any lessee, the accounts of the unit operator pertaining to the unit
operations shall be audited.  Compl. at ¶ 117; Plan of Unitization, Article 11.4.7, p. ID# 1673.

The Plan of Unitization also provides that the unit operator shall keep correct books,
accounts, and records of unit operations, and that the unit operator shall furnish to lessees periodic
reports of unit operations.  Compl. at ¶ 118; Plan of Unitization, Articles 13.5, p. ID# 1679 and 13.6,
p. ID# 1679.  Since January 11, 2005, Merit Energy has failed to pay PCA the payments and
royalties PCA is due as a lessee under the Plan of Unitization.  Compl. at ¶ 119.  Merit Energy has
also failed and refused to provide PCA with an accurate accounting regarding the payments and
royalties due to PCA despite PCA's repeated requests for it to do so.   *Id.* at ¶ 120.  Merit Energy,
as the unit operator for the Manistee 24 Unit, is currently in possession of the information regarding
the unit operations including governmental agency reports and filings, reports of natural gas
production, sales, condensate runs and stocks, inventory reports, production rates from the wells and
units, contract prices, and other information necessary to properly calculate the share of production
due to PCA. *Id.* at ¶ 121.  As a lessee under the Plan of Unitization, PCA is entitled to copies of all
information regarding the unit operations and any periodic reports since January 11, 2005.  PCA is
also entitled to a full accounting regarding its interests in the Manistee 24 Unit including a full
accounting of the total proceeds from the unit from the oil and gas sold since January 11, 2005,
along with a full breakdown of the allocation of said proceeds.  *Id.* at ¶ 122.

### 2.    Bahr Unit

Merit Energy is also the owner/operator of the Bahr Unit.  *Id.* at ¶ 123; Permit
Transfer (Bahr et al 4-24) (docket no. 1-4 at . ID# 170).  As the owner/operator of the Bahr Unit,

Merit Energy is currently in possession of the information regarding the unit operations, governmental agency reports and filings, production reports, sales reports, stocks, inventory reports, production rates, contract prices, and other information necessary to properly calculate the share of production due to PCA.  Compl. at ¶ 123.  As an owner of the oil, gas, and mineral interests in the Bahr Unit, PCA is entitled to all records and information regarding the unit operations, governmental agency reports and filings, production reports, sales reports, stocks, inventory reports, production rates, contract prices, and other information necessary to properly calculate the share of production due to PCA as a result of the production from the Bahr Unit.  *Id.* at ¶ 124.

### 3.  Accounting for both units

Merit Energy, as the unit operator of the Manistee 24 Unit, and as the owner/operator of the Bahr Unit, has the obligation and duty to provide PCA with access to all records pertaining to the Manistee 24 Unit and Bahr Unit, and production therefrom, and all information necessary to calculate the payments and royalties due to PCA.  *Id.* at ¶ 125.  For its relief, PCA requests that the Court enter a judgment ordering Merit Energy to provide and prepare, at its sole expense, a true and accurate accounting of all production from the Manistee 24 Unit and Bahr Unit along with all information regarding the distribution of same, provide to PCA all records, governmental agency reports and filings, production reports, sales reports, stocks, inventory reports, production rates, contract prices, and other information necessary to properly calculate PCA's share of the production from both the Manistee 24 Unit and Bahr Unit from January 11, 2005 through the present.  Compl. at p. ID# 33.  PCA also asks that the Court order a full audit of Merit Energy's accounts, books, and records pertaining to the Unit Operations under Article 11.4.7 for the Manistee 24 Unit, that this Court order a full audit of Merit Energy's books, accounts, and records regarding and relating to the

Bahr Unit, and that this Court grant such further relief as may be fair and just under the circumstances. *Id.*

### III.     Legal Standard for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d  at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

Because jurisdiction in this case is based upon diversity of citizenship of the parties, the Court will apply state law in accordance with the controlling decisions of the Michigan Supreme Court. *Bailey Farms, Inc. v. NOR-AM Chemical Co.*, 27 F.3d 188, 191 (6th Cir. 1994). To the extent that the Michigan Supreme Court has not yet addressed the issue presented, it is this Court's duty to anticipate how that court would rule. *Id.* Furthermore, in the absence of specific guidance from the Michigan Supreme Court, this Court is "obligated to follow published intermediate state appellate court decisions unless [it is] convinced that the highest court would decide differently." *Standard Fire Insurance Co. v. Ford Motor Co.*, 723 F.3d 690, 697 (6th Cir. 2013) (internal quotation marks omitted).

**IV.**    **PCA's motions for partial summary judgment regarding its interest in the property (docket no. 73) and for partial summary judgment regarding the extinguishment of the Belcher Lease (docket no. 74).**

**A.**    **PCA's interest in the property**

PCA contends that as of January 11, 2005, it owned the mineral interests which were reserved and excepted in the Belcher Deed. The Court agrees. "Michigan is an ownership-in-place state. That is, a surface owner owns the oil and gas beneath his land." *Manufacturers National Bank of Detroit v. Director of Department of Natural Resources*, 420 Mich. 128, 141, 362 N.W.2d 572 (1984). "Ordinarily a deed of land conveys the soil and all which it contains, within the boundaries of the particular description." *Pellow v. Arctic Mining Co.*, 164 Mich. 87, 105, 128 N.W. 918 (1910). "The owner of the fee of land may, however, convey the surface rights and reserve a fee in the mineral rights, and, having done so, each estate will be subject to the law of descent,

20

devise, and conveyance." *Id.* "Minerals in place may be severed from the remainder of the land by proper conveyances." *Rathbun v. State*, 284 Mich. 521, 534, 280 N.W. 35 (1938).

Here, the Belcher Deed included both an "exception" and a "reservation" of the "exclusive rights to all oil, gas and mineral rights in and under the foregoing described premises for a period of fifty (50) years after the execution of this deed." The terms "exception" and "reservation" encompass two separate legal concepts.

> If the grantor retains title to the mineral interests described in a deed, it is an exception. *Negaunee Iron Co. v. Iron Cliffs Co.*, 134 Mich. 264, 280, 96 N.W. 468 (1903), app. dis. 197 U.S. 463, 25 S.Ct. 474, 49 L.Ed. 836 (1905). At common law, this created a fee estate in the minerals, a corporeal hereditament. *Van Slooten v. Larsen*, 410 Mich. 21, 37, 299 N.W.2d 704 (1980), app. dis. 455 U.S. 901, 102 S.Ct. 1242, 71 L.Ed.2d 440 (1982). The deed conveyed no interest in the excepted part to the grantee. Therefore, when the grantor excepted all mineral rights, there was no need to expressly state that the right to sever or remove the minerals was an incident of ownership. *Wait v. Baldwin*, 60 Mich. 622, 626, 27 N.W. 697 (1886).

*Stevens Mineral Co. v. State*, 164 Mich.App. 692, 697, 418 N.W.2d 130 (1987).

> On the other hand, a reservation is generally seen as the creation of a new right or interest in the grantor. A reservation is really a legal fiction which treats the grantor's reservation as an implied grant from the grantee back to the grantor. Normally, a reservation is an incorporeal hereditament, like rent or a profit a prendre. Traditionally, words of inheritance were essential to extend the reservation beyond the life estate in the grantor. *Negaunee*, *supra*, at p. 280, 96 N.W. 468.

*Stevens Mineral Co.*, 164 Mich. App. at 697-98.[7] *See Rathbun*, 284 Mich. at 534 (a reservation in a deed may effect a severance of the minerals from the remainder of the lands).

"[A] deed of conveyance, if not ambiguous in its terms, must be construed as written." *Gawrylak v. Cowie*, 350 Mich. 679, 683-84, 86 N.W.2d 809 (1957). *See Little v. Kin*, 468

---

[7] "A 'profit à prendre' is some right growing out of the soil." *St. Helen Shooting Club v. Mogle*, 234 Mich. 60, 65, 207 N.W. 915 (1926). It is "primarily the right to acquire, by severance or removal from another's land, something previously constituting part of the land, such as minerals" *Stevens Mineral Co.*, 164 Mich.App. at 698.

Mich. 699, 700, 664 N.W.2d 749 (2003) ("[w]here the language of a legal instrument is plain and unambiguous, it is to be enforced as written and no further inquiry is permitted").  Under Michigan law, a deed should be strictly construed against the grantor so that the grantee is conferred the greatest estate that the terms of the deed will permit.  *Thomas v. Steuernol*, 185 Mich. App. 148, 155, 460 N.W.2d 577 (Mich. App.1990); *Stevens Mineral Co*, 164 Mich.App. at 698.  Thus, "any reservation or exception by the grantor must be narrowly construed."  *Thomas*, 185 Mich. App. at 155.

Here, the plain and unambiguous language in the Belcher Deed excepted and reserved to the grantors a fixed term interest in the mineral rights, i.e., "exclusive rights to all oil, gas and mineral rights in and under the foregoing described premises for a period of fifty (50) years after the execution of this deed, together with the right of ingress and egress thereon and the use of the surface of said real estate as may be reasonably necessary for the development and production of such oil, gas and minerals*"*  Belcher Deed at p. ID# 635.   By excepting the oil, gas and other minerals, Belcher retained title to those mineral interests for 50 years.  *Negaunee Iron Co.*, 134 Mich. at 280.  In addition, by reserving the right to develop and produce the oil, gas and minerals, Belcher created a new right in himself to enjoy that incorporeal hereditament for 50 years.  *Id.* Nothing in the Belcher Deed created any mineral interest in the grantor, his heirs, successors or assigns, beyond the 50 year term which expired on January 11, 2005.

The fact that Merit Energy continued to produce oil and gas under the Belcher Lease after January 11, 2005 did not extend the 50-year term set forth in the Belcher Deed.

Generally, the "owner of a term for years cannot create an interest in land to endure beyond the term." 2 H. Williams & C. Meyers, *Oil and Gas Law* § 332, at p. 118 (1995).  *See also* 2 Powell, *The Law of Real Property* ¶ 203[3] (1993) (expressing this rule in regards to estates for life).  It follows that the owner of a

mineral interest terminable upon a certain date can grant an oil and gas lease, but that lease is not capable of enduring beyond the term of the grantor's estate.  1 E. Kuntz, *Oil and Gas* §§ 9.4, 20.3, 20.5 (1989); 2 H. Williams & C. Meyers, *Oil and Gas Law* § 332 (1995); *Hillis v. Dils*, 53 Ind.App. 576, 100 N.E. 1047 (1913) (owner of determinable fee may not convey more than determinable fee).

*RLM Petroleum Corp. v. Emmerich*, 896 P.2d 531, 533 (Okla. 1995).  *See Edmonston v. Home Stake Oil & Gas Corp.*, 629 F.Supp. 620, 624 (D. Kan.1986) ("the owner of the future interest should not be deprived of that interest by 'constructive production' under a unit agreement which the future interest owner has not joined or authorized"), quoting 6 Williams and Meyers, *Oil and Gas Law* § 961.3 n. 1 (1985).

"Only where the language of the deed creating the fixed term deed indicates an intent to authorize the term interest owner to encumber both the term interest and the future interest with a lease, will an oil and gas lease survive the end of the fixed term period."  2-3 Williams & Meyers, *Oil and Gas Law* § 332 (LexisNexis Matthew Bender 2014).  *See, e.g.*, *Netahla v. Netahla*, 346 P.3d 1079, 1081-82 (Kan. 2015) ("[t]he event which perpetuates the term of the mineral interest must be found in the instrument creating it.  A deed or other instrument conveying oil and gas in place *for a fixed term of years and so long thereafter as oil and/or gas is being produced from the property or the property is being developed or operated* creates a base or determinable fee.") (internal quotations and citations omitted, emphasis added); *Rox Petroleum, L.L.C. v. New Dominion, L.L.C.*, 184 P.3d 502, 505 (Okla. 2008) ("[a] deed, such as the 1927 mineral deed, given for a term and so long after as oil and gas is produced transfers a determinable fee upon a conditional limitation").

Here, the Belcher Deed did not create a determinable fee upon a conditional limitation.  *See Netahla*, 346 P.3d at 1081-82; *Rox Petroleum, L.L.C.*,  184 P.3d 502. When the excepted and reserved mineral interests in the Belcher Deed terminated, those interests reverted

Case 1:13-cv-01243-RSK  ECF No. 104 filed 07/28/15  PageID.2503  Page 24 of 41

PCA. *See Thomas*, 185 Mich. App. at 155; *Stevens Mineral Co.*, 164 Mich. App. at 698 (deed construed to provide grantee with the greatest estate that the terms of the deed will permit). In summary, PCA owned the mineral interests in the property as of January 11, 2005. Accordingly, PCA's motion for partial summary judgment, asking the Court to declare that PCA owns the oil, gas and mineral interest in the property, and that PCA's interest in the property vested on January 11, 2005 (docket no. 73) will be granted.

### B.     Extinguishment of the Belcher Lease

PCA also contends that the Belcher Lease was extinguished when the mineral interest reverted to PCA on January 11, 2005. The Court agrees. The Belcher Lease executed in 1972 had an habendum clause which could extend the lease beyond the initial 5-year primary term, i.e., "so long thereafter as operations  .  .  .  are conducted upon said land."  However, as discussed, the lessors' mineral interest terminated on January 10, 2005.  They had no authority to execute a lease which endured beyond their 50-year interest and the continued operation of the lease did not extend the interest beyond the 50-year term. *RLM Petroleum Corp.*, 896 P.2d at 533; *Edmonston*, 629 F.Supp. at 624.

The fact that the Belcher Deed excepted and reserved only a 50-year interest in the oil and gas was well-known by the original lessee of that mineral interest.  In a drilling clearance dated August 14, 1975, nearly three years after executing the Belcher Lease, Shell Oil Company explicitly noted that the Belcher Deed created a term mineral interest which expired on January 11, 2005 and that it had to deplete the reservoir within 30 years:

> Lease MH-38919 - Belcher (Ryder) covers the South 40 acres of the drilling unit. The lessors of this lease own only a term mineral interest expiring January 11, 2005, the surface rights and the reversionary rights (unleased) in the minerals being owned by Packaging Corporation of America. **This term mineral interest cannot**

>   **be perpetuated by production, therefore, it is essential that the reservoir under this unit be depleted prior to January 11, 2005**.

Shell Oil Company Drilling Clearance Form (Aug. 14, 1975) (docket no. 95-1 at pp. ID## 2297-98) (emphasis added).

Merit Energy relies on *Steger v. Muenster Drilling Co., Inc.*, 134 S.W.3d 359 (Tex. Ct. App. 2003), for the proposition that "a time limit placed on when one may execute a mineral lease does not limit the type of leases (including those which may extend beyond the time period in which the owner may enter into a lease) which may be executed during that time period." Merit Energy's reliance is misplaced. Unlike the present case, the mineral interest at issue in *Steger* did not involve an exception and reservation for a fixed term of years. Rather, *Steger* involved the construction of a will, in which the decedent's widow was granted "full[] power and authority" to "manage, control and lease" the mineral interest "for all purposes . . . during her life time and to extract therefrom all oil, gas and or other minerals." *Id.* at 373. Viewing the will in its entirety, including portions of the will which included secondary life estates in the decedent's children, the court construed it as authorizing the widow to, among other things, "make[] oil and gas leases that extended beyond her lifetime." *Id.* Here, the Belcher Deed did not include similar language authorizing the holder of the excepted and reserved mineral interest to execute a lease which extended beyond the term of that interest.

Finally, Merit Energy contends that its continuous and ongoing activity on the property pursuant to the Belcher Lease rendered it a lawful tenant by sufferance. Merit Energy Response (docket no. 84 at p. ID# 1731). *See Felt v. Methodist Educational Advance*, 251 Mich. 512, 517, 232 N.W. 178, 180 (1930) ("[a]s a general rule, when a tenant comes rightfully into possession of land by permission of the owner and continues to occupy the same after the time for

which, by such permission, he had the right to hold the same, he becomes a tenant by sufferance"). Merit Energy's reliance on the common law doctrine of "tenant by sufferance" is misplaced.

"Given the distinctive relationship between a mineral estate lessor and lessee, courts routinely reject the view that traditional landlord-tenant rules apply to oil and gas leases." *Maralex Resources, Inc., v. Chamberlain*, 320 P.3d 399, 402-03 (Colo. App. 2014) (listing cases).  Under Michigan law, an oil and gas lease is defined as "a transfer of an interest in oil and gas." *Energetics, Ltd. v. Whitmill*, 442 Mich. 38, 47, 497 N.W.2d 497 (1993).  "At termination of such a lease, the oil and gas rights revert to 'the grantors of the lease, their heirs or assigns.'"  *Id.* citing *Jupiter Oil Co v. Snow*, 819 S.W.2d 466, 468 (Tex.1991); *Kaiser v. Love*, 163 Tex. 558, 560, 358 S.W.2d 586 (1962).

Based on the record, Merit Energy was an innocent trespasser, because it continued to produce oil and gas after its lease was extinguished on January 11, 2005.  *See Eagle Oil Corp. v. Cohassett Oil Corp.*, 263 Mich. 371, 378, 248 N.W. 840 (1933) (defining an innocent trespasser as "[a] person who in good faith enters into peaceable possession of land upon which he owns an oil and gas lease and produces oil and gas therefrom, and thereafter said lease is declared void or invalid"), quoting *Henry and Barnes v. Winona Oil Company*, 83 Okl. 253, 200 P. 985 (1921).  In the case of an innocent trespasser,  "the measure of damages to the landlord in an action for an accounting for the oil and gas produced from said premises by the lessee is the value of the oil at the surface or in pipe line or tanks, wherever the same may be, less the reasonable cost of producing the same."  *Id.  See also*, *Robinson v. Gordon Oil Co.*, 266 Mich. 65, 69, 253 N.W. 218 (1934) ("[t]he general rule in the United States in actions for the conversion of oil, as in the case of conversion of minerals and other natural products of the soil is that, although a willful trespasser is liable for the

26

enhanced value of the oil at the time of conversion without deduction for expenses or for improvements by labor, an innocent trespasser is liable only for the value of the oil undisturbed; that is, he is entitled to set off the reasonable cost of production").  For these reasons, the Court concludes that the Belcher Lease has been extinguished, and Merit's Energy's current status is that of an innocent trespasser.  Accordingly, PCA's motion for partial summary judgment regarding extinguishment of Merit Energy's lease (docket no. 74) will be granted.

>    **V.    Merit Energy's motion for summary judgment regarding PCA's claims for breach of fiduciary duty (Count I) and breach of the Plan of Unitization (Count V) (docket no. 77).**

PCA has alleged that Merit Energy breached its duties as the operator of the Manistee 24 Unit under the Plan of Unitization (Count V) and breached its fiduciary duty owed as both the operator of the Manistee 24 Unit and the Bahr Unit (Count I).  Merit Energy seeks summary judgment on both of these claims.  To the extent that Merit Energy owes any fiduciary duty to PCA, such a duty would arise from Merit Energy's position as the operator under the Plan of Unitization and the operator of the Bahr Unit.  6-9 Williams & Meyers, *Oil and Gas Law* § 990 (LexisNexis Matthew Bender 2014) ("Fiduciary principles are sometimes said to be applicable to the relationship of the operator under a pooling, unitization or joint operating agreement and persons having interests in the premises affected by such agreement, but other cases reject this approach.").  *See generally*, *Leck Continental Oil Company*, 800 P.2d 224, 229 (Okla. 1989) (noting that Oklahoma courts "have recognized the existence of a fiduciary duty owed by a unit to the royalty owners and lessees who are parties to the unitization agreement or subject to the order creating the unit," and that "[t]his is not a duty created by the lease agreement but rather by the unitization order and agreement").

Fiduciary duties can also arise where the parties undertake to develop oil and gas wells.  Under Michigan law, projects for the development of oil and gas wells are considered to be joint ventures.  *Johnson v. Ironside*, 249 Mich. 35, 44, 227 N.W. 732 (1929); *Schmude Oil Co. v. Omar Operating Co.*, 184 Mich.App. 574, 583, 458 N.W.2d 659 (1990).  Joint venturers involved in such projects owe a fiduciary duty to each other.  *Van Stee v. Ransford*, 346 Mich. 116, 125-26, 77 N.W.2d 346 (1956); *Schmude*, 184 Mich. App. at 583.  While this fiduciary duty requires the highest degree of loyalty from all participants, the heaviest burden falls on the manager of the enterprise, which, in the case of an oil and gas ventures, is typically the operator.  *See Schmude*, 184 Mich. App. at 584.   Assuming that the Plan of Unitization and Bahr Unit are joint ventures to develop oil and gas wells, then any fiduciary duty owed by Merit Energy to PCA would arise from relationship as joint venturers.

The Plan of Unitization, dated April 1, 1991, stated that it has for its purpose "the unitized management, operation, and possible further development of the Unitized Formation as herein defined, all to the end that the voluntary pooling of the interests of the parties hereto into a single pooled unit will facilitate the production of Unitized Substances as herein defined in an efficient, expeditious, and economic manner to the mutual benefit of all parties in interest herein."  Plan of Unitization at p. ID# 1665.  The Declaration of Pool, dated January 26, 1978, was made by Shell Oil Company in its capacity as the lessee in a number of leases, including the Belcher Lease.  *See* Declaration of Pool (docket no. 83-22).  PCA was not a party to either of these ventures.  PCA is not identified as a mineral owner in the Plan of Unitization for the Manistee 24 Unit nor was it the lessor in any of the leases included in the Declaration of Pool for the Bahr Unit.  *See* Article 2.1.1, p. ID# 1667 ("Exhibit A is a schedule that describes each Tract in the Unit Area and lists by

tract the name, type of ownership and decimal share of each owner"); Exhibit "A", p. ID# 1687; Declaration of Pool, Bahr Unit (docket no. 83-22). Neither PCA nor any previous owner of the reversionary interest signed or ratified the Plan of Unitization or a lease included in the Declaration of Pool. Parties may enter into a voluntary agreement to pool properties for development of oil and gas and to allocate production in the pooled unit. *Manufacturers National Bank of Detroit*, 420 Mich. at 147-48. However, "[v]oluntary agreements for the unit operation of an oil field are binding only upon the persons who execute them, or their heirs, successors, assigns, and legal representatives[.]"  38 Am. Jur. 2d, *Gas and Oil* § 173 (2015). *Cf., The California Company v. Britt*, 247 Miss. 718, 729, 154 So.2d 144 (1963) ("The owner of a mineral interest who neither has leased  .  .  .  nor unitized cannot recover for an interest in production from other land in the unit.").

Here, PCA was not a party to the Plan of Unitization, did not execute a lease subject to the Declaration of Pool, and did not participate in a joint venture to develop the Manistee 24 Unit or the Bahr Unit.  There is no agreement from which a fiduciary relationship could arise between Merit Energy and PCA to form the basis of the breach of fiduciary duty as alleged in Count I. Furthermore, PCA did not sign or ratify the Plan of Unitization and cannot claim that Merit Energy violated the terms of that Plan as alleged in Count V.  Accordingly, Merit Energy's motion for summary judgment as to Count I (breach of fiduciary duty) and Count V (breach of Plan of Unitization) (docket no. 77) will be granted.

**VI.   PCA's motion for partial summary judgment regarding the applicable statute of limitations (docket no. 75) and Merit Energy's motion for summary judgment regarding the statute of limitations (docket no. 77)**

### A.   Overview on statute of limitations

PCA has raised five legal and equitable claims against Merit Energy: breach of the Plan of Unitization (Count V); conversion (Count VI); breach of fiduciary duty (Count I); breach of reasonably prudent operator standard (Count IV); and unjust enrichment (Count VII).   As discussed, Merit Energy will be granted summary judgment as to Count I and Count V.   In addition, PCA seeks four remedies: a constructive trust (Count II); an equitable lien (Count III); declaratory judgment as to royalties (Count VIII); and an action for an accounting (Count IX).

### B.   Remedies

### 1.   Constructive trust (Count II)

In order to prevent Merit Energy from profiting from its wrongful acts, PCA asks the Court to impose a constructive trust for the entire amount of the production due and owing to PCA from the Manistee 24 Unit and the Bahr Unit from January 11, 2005 through the present date.   PCA contends that M.C.L. § 600.5813, the six-year statute of limitations for "other personal actions," applies to this count.

"A constructive trust is not an independent cause of action; rather, it is an equitable remedy. Thus, the counts in plaintiffs' complaints that sought to impose a constructive trust were legally insufficient to state a claim."   *CPAN v. MCCA*,  305 Mich.App. 301, 325-26, 852 N.W.2d 229 (2014) (internal citations omitted).  *See Dingman v. OneWest Bank, FSB*, 859 F.Supp.2d 912, 921 (E.D. Mich. 2012) ("plaintiffs' constructive trust claim  .  .  .  fails to state a plausible claim because no independent cause of action for constructive trust exists; a constructive trust is merely a remedy").  Because the establishment of a constructive trust is a remedy rather than a claim for

relief, PCA's motion for partial summary judgment regarding the applicable statute of limitations (docket no. 75) will be denied on this count.

### 2.      Equitable lien (Count III)

PCA asks the Court to impose an equitable lien on the future production and revenue from the Manistee 24 Unit and the Bahr Unit, and on any equipment and leases in the units, until such time as PCA is paid in full for its share of the production from the units. PCA contends that M.C.L. § 600.5813 applies to this count.  An equitable lien is not a cause of action but a remedy. *See Lorimer ex rel. Estate of Lorimer v. Berrelez*, 331 F.Supp.2d 585, 593 (E.D. Mich. 2004).  "An equitable lien is the right to have property subjected in a court of equity to the payment of a claim. . . It is neither a debt nor a right of property, but a remedy for a debt."  *Johnson v. Bush Lumber Co.*, 258 Mich. 306, 308-09, 241 N.W. 819 (1932) (internal quotation marks omitted).  "In the absence of a written contract, an equitable lien will be established only where, through the relations of the parties, there is a clear intent to use an identifiable piece of property as security for a debt." *Senters v. Ottawa Savings Bank, FSB*, 443 Mich. 45, 53, 503 N.W.2d 639 (1993).  Because the establishment of an equitable lien is a remedy rather than a claim for relief, PCA's motion for partial summary judgment regarding the applicable statute of limitations (docket no. 75) will be denied on this count.

### 3.      Declaratory judgment (Count VIII)

PCA contends that its request for declaratory judgment as to royalties and payments due is subject to M.C.L. § 600.5813.  However, PCA's claim for declaratory judgment is not subject to Michigan's statute of limitations, being brought under Fed. R. Civ. P. 57 and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.  See* Fed. R. Civ. P. 57 ("[t]hese rules govern the procedure

31

for obtaining declaratory judgment under 28 U.S.C. § 2201").  *See Nationwide Mutual Fire Insurance Co. v. Creech*, 431 F. Supp. 2d 710, 712  at fn. 1 (E.D. Ky. 2006) ("Declaratory judgment acts are procedural rules; therefore, in a diversity case, the Federal Declaratory Judgment Act applies"), citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).  Accordingly, PCA's motion for partial summary judgment regarding the applicable statute of limitations (docket no. 75) will be denied on this count.[8]

### C.       PCA's Legal Claims

Under Michigan law, in deciding which period of limitations controls, the Court must determine the true nature of the claim.  *Adams v. Adams*, 276 Mich.App. 704, 710-11, 742 N.W.2d 399 (2007).  "It is well settled that the gravamen of an action is determined by reading the complaint as a whole, and by looking beyond mere procedural labels to determine the exact nature of the claim."  *Id.* citing *David v. Sternberg*, 272 Mich.App. 377, 381, 726 N.W.2d 89 (2006) and *Tipton v. William Beaumont Hospital*, 266 Mich.App. 27, 33, 697 N.W.2d 552 (2005).

### 1.       Breach of implied covenant (Count IV)

PCA alleged that Merit Energy breached the implied covenant to act as a reasonably prudent operator of the Manistee 24 Unit and the Bahr Unit.  *See Compton v. Fisher-McCall, Inc.*, 298 Mich. 648, 653-54, 299 N.W. 750 (1941) (recognizing that an oil and gas lease includes an

---

[8] In reaching this determination, the Court notes that plaintiff originally brought this action in state court.  This being said, under Michigan law, statutes of limitations do not apply to declaratory judgments. *Taxpayers Allied for Constitutional Taxation v. Wayne County*, 450 Mich. 119, 537 N.W.2d 596 (1995).

> Declaratory relief is a mere procedural device by which various types of substantive claims may be vindicated.  There are no statutes which provide that declaratory relief will be barred after a certain period of time.  Limitations periods are applicable not to the form of the relief but to the claim on which the relief is based.

*Id.* at 128 (citation and footnote omitted).

implied covenant to act as a reasonably prudent operator); *Dietrich v. Sun Exploration and Production Co.*, 784 F.Supp. 383, 387-88 (E.D. Mich.1992) ("[u]nder Michigan law, an oil or gas producer has a duty to act as a reasonable and prudent oil producer in operating the field and in producing the oil or gas"); 5-8 Williams & Meyers, *Oil and Gas Law* § 806.3 (Lexis Nexis Matthew Bender 2014) (Michigan has adopted the prudent operator standard as "the general rule governing performance of implied lease covenants"). *Cf.* M.C.L. § 565.5 ("No covenant shall be implied in any conveyance of real estate, except oil and gas leases, whether such conveyance contain special covenants or not"). However, the Belcher Lease was extinguished as of January 11, 2005. PCA cannot claim that Merit Energy violated an implied covenant in this extinguished lease. Under the facts of this case, the gravamen of PCA's legal claim is one of conversion. Accordingly, PCA's motion for partial summary judgment regarding the applicable statute of limitations (docket no. 75) and Merit Energy's motion for summary judgment (docket no. 77) will be denied on this count.

### 2.    Conversion (Count VI)

#### a.    Statute of limitations

PCA alleged that Merit Energy converted the oil and gas in the Manistee 24 Unit and the Bahr Unit. "Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Thoma v. Tracy Motor Sales, Inc.*, 360 Mich. 434, 438, 104 N.W.2d 360 (1960). Under Michigan law, "[t]he gist of the action [for conversion of oil] is not an invasion of the land itself, and the consequent damage to the mineral estate, but an unlawful appropriation of the oil and gas when brought to the surface; that is, an invasion of the owner's right in the oil and gas as personal property. *Ross v. Damm*, 278 Mich. 388, 393-94, 270 N.W. 722 (1936). Given this claim, the three year statute of limitations set forth in

33

M.C.L. § 600.5805(10) for "all actions to recover damages . . . for injury to a person or property" applies.

The next issue is when this claim accrued. Pursuant to M.C.L. § 600.5827, a claim accrues "at the time the wrong upon which the claim is based was done regardless of the time when damage results." Here, Merit Energy committed the wrong against PCA when it appropriated the oil and gas from the property, after the mineral interests reverted to PCA on January 11, 2005.[9] For purposes of determining when a claim accrues in the context of oil and gas production, the periodic royalty payments under the lease are considered analogous to payments made under an installment contract, i.e., "[e]ach allegedly deficient royalty payment made to [the plaintiff lessor] constituted a separate and discrete breach of the lease agreement." *Romeo Investment Limited v. Michigan Consolidated Gas Co.*, No. 260320, 2007 WL 1264008 at *6 (Mich. App. May 1, 2007). As with an installment contract, each allegedly deficient royalty payment constituted a separate and distinct breach of the lease agreement, with the limitation period running from the due date of each payment. *Id.* citing *H.J. Tucker and Associates, Inc. v. Allied Chucker and Engineering Co.*, 234 Mich. App. 550, 562-63, 595 N.W.2d 176 (1999).

A conversion consists of "any distinct act of dominion wrongfully exerted over another's personal property." *Thoma*, 360 Mich. at 438. Here, the Court views each sale of oil and gas produced from the Manistee 24 Unit and Bahr Unit as constituting a separate and discrete "act of dominion" over PCA's property. *Id.* Each such act is analogous to a periodic payment under an

---

[9] PCA states that it did not know it owned the mineral interest in the property land until April, 2013. *See* Response (docket no. 83 at p. ID# 1423). However, PCA's discovery of its interest is not relevant to determining when its conversion claim accrued. The Michigan Supreme Court has rejected the assertion that "a claim does not accrue until a plaintiff knows, or objectively should know, that he has a cause of action and can allege it in a proper complaint." *Trentadue v. Buckler Lawn Sprinkler*, 479 Mich. 378, 389, 738 NW2d 664 (2007).

oil and gas lease or an installment contract, with a separate claim for conversion accruing each time that Merit Energy sold oil and gas appropriated from PCA's mineral interest, without making an appropriate royalty payment to the proper party. Accordingly, PCA has a claim for conversion which accrued each time that Merit Energy sold oil or gas produced from the property commencing on October 8, 2010 (three years prior to the filing of this action). This result is consistent with Merit Energy's alternative position that the three year statute of limitations set forth in M.C.L. § 600.5805(10) applies. *See* Merit Energy's Brief at pp. ID## 1051-52 (docket no. 78).

### b.    Laches

Merit Energy also contends that PCA's conversion claim is barred by the equitable defense of laches. The Court disagrees. "A statutory limitations period represents a legislative determination of that reasonable period of time that a claimant will be given in which to file an action." *Lothian*, 414 Mich. at 165-66. "Laches, the corresponding judicially-imposed equitable principle, denotes the passage of time combined with a change in condition which would make it inequitable to enforce a claim against the defendant." *Id.* at 168 (footnote and internal quotation marks omitted). "Time alone does not constitute laches, but there must have been a change of conditions which would render it inequitable to enforce the claim, or a showing that the defendant was prejudiced by the delay." *Brydges v. Emmendorfer*, 311 Mich. 274, 279, 18 N.W.2d 822 (1945) (internal quotation marks and citations omitted). "The doctrine of laches reflects the exercise of the reserved power of equity to withhold relief otherwise regularly given where in the particular case the granting of such relief would be unfair and unjust. . . Simply stated, laches is concerned with the *effect* of delay, while limitations are concerned with the *fact* of delay." *See Lothian v. City of*

35

*Detroit*, 414 Mich. 160, 168, 324 N.W.2d 9 (1982) (internal citations, quotation marks and brackets omitted) (emphasis in original).

The Michigan Supreme Court has recognized that in "exceptional circumstances," laches could bar a legal claim brought within the statute of limitations. *See Kaminski v. Cowan*, 287 Mich. 62, 67, 282 N.W. 902 (1938) ("[m]ere delay in asserting a claim for a period less than the statute of limitations does not, in the absence of *exceptional circumstances*, constitute such laches as will defeat plaintiff's recovery *either in law or in equity*") (emphasis added). An example of the type of exceptional circumstances sufficient to apply laches appears in *Wilcher v. City of Highland Park*, No. 1876546, 1997 WL 33354455 (Mich. App. Jan. 24, 1997) (unpublished). In *Wilcher*, the plaintiffs filed a medical malpractice action against the defendant city in 1994 which arose from a power outage at a city hospital in 1975. Due to the power outage, a patient at the hospital, Marcella Wilcher, had to be transferred to a different hospital for an emergency caesarean section, with the delay resulting in her child being born with developmental disabilities. The court found that laches barred the plaintiffs' claim after noting that between 1975 and 1994, the defendant city had been prejudiced due to the loss of virtually all of the evidence relating the power outage; the hospital closed in 1976; the building remained vacant until 1986, when it was purchased and renovated for use as an apartment building; all evidence of the hospital's emergency lighting system was destroyed during the renovations; and defendant presented affidavits showing that city and state records concerning the hospital had either been destroyed or were incomplete. *Wilcher*, 1997 WL 33354455. These types of "exceptional circumstances" do not exist in this well-documented conversion case. Accordingly, PCA's motion for partial summary judgment regarding the applicable statute of limitations (docket no. 75) will be denied on this count. Merit Energy's motion for

36

summary judgment (docket no. 77) will be granted to the extent that it seeks to apply the three year statute of limitations to PCA's conversion claim, and denied to the extent it seeks to apply the doctrine of laches to this legal claim.

### D.     PCA's equitable claims

The Michigan Supreme Court "has long recognized that statutes of limitation may apply by analogy to equitable claims." *Taxpayers Allied for Constitutional Taxation v. Wayne County*, 450 Mich. 119, 127, n. 9, 537 N.W.2d 596 (1995).  "Equity follows the analogies of the law in all cases where an analogous relief is sought upon a similar claim." *Michigan Ins. Co. of Detroit v. Brown*, 11 Mich. 265, 272 (1863).  *See Lothian*, 414 Mich. at 169 (same).

### 1.     Unjust enrichment (Count VII)

PCA's claim of unjust enrichment arises from Merit Energy's operation of the Manistee 24 Unit and the Bahr Unit. As discussed, PCA cannot bring an action based upon either the Plan of Unitization or the Declaration of Pool.  However, PCA may be able to bring an unjust enrichment claim, which is the equitable counterpart of a legal claim for breach of contract. *Keywell & Rosenfeld v. Bithell*, 254 Mich.App. 300, 328, 657 N.W.2d 759 (2002).   To establish a claim of unjust enrichment, PCA must establish (1) the receipt of a benefit by Merit Energy from PCA, and (2) an inequity resulting to PCA because of the retention of the benefit by Merit Energy.  *See Belle Isle Grill Corp. v. City of Detroit*,  256 Mich.App. 463, 478, 666 N.W.2d 271 (2003).  "If this is established, the law will imply a contract in order to prevent unjust enrichment.  However, a contract will be implied only if there is no express contract covering the same subject matter."  *Id.* (internal citations omitted).  *See Slusher v. Frome*, 364 Mich. 110, 111-12, 110 NW2d 672 (1961) (when a plaintiff has set forth both legal and equitable claims seeking identical relief and covering the same

subject matter, e.g., breach of contract and an accounting in equity resulting in the same damages, the proper course is generally dismissal of the equitable claim).

Michigan Courts have applied M.C.L. § 600.5807(8), the six-year statute of limitations for a breach of contract, to claims of unjust enrichment. *See Romeo Investment Limited*, 2007 WL 1264008 at *8 (the court chose "to apply the same six-year period of limitations to the unjust enrichment claim as that applicable to plaintiff's breach of contract claim") citing *Huhtala v. Travelers Insurance Co.*, 401 Mich. 118, 125, 257 NW2d 640 (1977) ("[w]e are of the opinion that the time for bringing an action for promissory estoppel is governed by the contract statute of limitations, six years, and that plaintiffs' action was therefore timely commenced.").[10] A claim for unjust enrichment accrued each time that Merit Energy sold oil or gas produced from the property commencing on October 8, 2007 (six years prior to the filing of this action). For its part, Merit Energy contends that PCA's equitable claim for unjust enrichment is barred by the equitable defense of laches. *See Lothian*, 414 Mich. at 168; *Brydges*, 311 Mich. at 279.

Here, the Court concludes that neither PCA nor Merit Energy are entitled to their requested equitable relief because neither have "clean hands" in this dispute. "No citation of authority is necessary to establish that one who seeks the aid of equity must come in with clean hands." *Charles E. Austin, Inc. v. Secretary of State*, 321 Mich. 426, 435, 32 N.W. 2d 694 (1948). Where a party seeks equitable relief, "it is elementary that one who seeks equity should be required to do equity, even though that question is not raised by either party." *Petition of Aten*, 332 Mich.

---

[10] The Court notes that in *Trudel v. City of Allen Park*, Nos. 304507, 304567 and 312351, 2013 WL 6037152 at *17 (Mich. App. Nov. 14 ,2013), a later panel of the Michigan Court of Appeals found that "[t]he statute of limitations for unjust enrichment claims is six years" citing M.C.L. § 600.5813 ("All other personal actions shall be commenced within the period of 6 years after the claims accrue and not afterwards unless a different period is stated in the statutes") and M.C.L. § 600.5815 ("The prescribed period of limitations shall apply equally to all actions whether equitable or legal relief is sought. . . .").

77, 83, 50 N.W.2d 721 (1952). *See also, Attorney General v. Thomas Solvent Company*, 146 Mich.

App. 55, 66, 380 N.W.2d 53 (1983) ("[o]ne who seeks equity must do or offer to do equity"). The

"clean hands maxim" applies both to a plaintiff asserting an equitable claim, *see Stanchik v. Winkel*,

394 Mich. 375, 382, 385-87; 230 N.W.2d 529 (1975), and a defendant asserting an equitable defense

such as laches, *see Thomas Solvent Company*, 146 Mich. App. at 66.

> The clean hands maxim is an integral part of any action in equity. The U.S. Supreme
> Court captured the essence of the maxim when it said:
>
> > (The clean hands maxim) is a self-imposed ordinance that closes the
> > doors of a court of equity to one tainted with inequitableness or bad
> > faith relative to the matter in which he seeks relief, however improper
> > may have been the behavior of the defendant. That doctrine is rooted
> > in the historical concept of the court of equity as a vehicle for
> > affirmatively enforcing the requirements of conscience and good
> > faith. This presupposes a refusal on its part to be the abettor of
> > iniquity.

*Stachnik*, 394 Mich. at 382, quoting *Precision Instrument Manufacturing Co. v. Automotive*

*Maintenance Machinery Co.*, 324 U.S. 806, 814 (1944) (internal quotation marks omitted).

Both PCA and Merit Energy seek equitable relief with respect to the production from

the term mineral interest. PCA claims that Merit Energy has been unjustly enriched because it

produced minerals owned by PCA since 2005, while Merit Energy claims that PCA is barred by

laches because PCA did not assert its rights to the mineral interest until 2013. Both parties seek

equitable relief on the basis that the "other" party should have known about the reversion back in

2005. That being said, neither PCA nor Merit Energy identified the 50-year term interest when it

expired on January 11, 2005, even though the instrument creating the interest was recorded and has

been a matter of public record since January 24, 1955. *See* Belcher Deed (docket no. 73-3 at p. ID#

635). *See also*, discussion at § I.B. In this regard, the original lessor had no difficulty in noting the

existence of the term mineral interest as reflected in its internal files from 1974, 1975 and 1979.  *See*

Merit Land Files (Original Title Opinion, May 13, 1974) (noting reversion of mineral interest on

January 11, 2005) and (Third Supplemental Title Opinion, Feb. 12, 1979) (noting that the term

interest endures until January 10, 2005 and that "the reversionary interest is owned by Packaging

Corporation of America") (docket no. 86-3 at pp. ID## 2146-50, 2156-60); Shell Oil Company

Drilling Clearance Form (Aug. 14, 1975) (noting that the term mineral interest expires on January

11, 2005, that the reversionary rights were "unleased", and that because "[t]his term mineral interest

cannot be perpetuated by production . . .  it is essential that the reservoir under this unit be depleted

prior to January 11, 2005") (docket no. 95-1 at pp. ID## 2297-98).  *See also*, discussion at § IV.B.,

*supra*.  It appears that both parties could have pursued their homework more rigorously.

"[A] court of equity molds its relief according to the character of the case." *Walworth*

*v. Wimmer*, 200 Mich. App. 562, 564, 504 N.W.2d 708 (1993).  In this instance, both PCA and Merit

Energy are "tainted with inequitableness" because neither party recognized that the term mineral

interest expired in 2005.  For that reason, neither PCA nor Merit Energy are entitled to equitable

relief related to their current dispute involving that interest.  PCA's motion for partial summary

judgment regarding the applicable statute of limitations will be denied on this count (docket no. 75),

Merit Energy's motion for summary judgment (docket no. 77) will be denied to the extent it asserts

that this count is barred by laches, and plaintiff's claim for unjust enrichment will be dismissed.[11]

---

[11] The Court notes that Merit Energy's motion for summary judgment also contends that PCA's demand for pre-complaint interest fails.  *See* Merit Energy's Motion for summary judgment (docket no. 77 at p. ID# 1027).  However, Merit Energy does not address this issue in its supporting brief, and essentially relegates its arguments to footnote 9 in its reply brief.  *See* Merit Energy Reply Brief (docket no. 98 at pp. ID## 2337-38).  The Court does not view this issue as sufficiently briefed.  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).  Accordingly, the Court deems this argument waived.

## VII.    Conclusion

For the reasons stated in this opinion,

PCA's "Motion for partial summary judgment regarding PCA's interest in the lands" (docket no. 73) is **GRANTED**;

PCA's "Motion for partial summary judgment regarding the extinguishment of defendant's lease covering PCA's lands" (docket no. 74) is **GRANTED**;

PCA's "Motion for partial summary judgment regarding the applicable statute of limitations that applies to PCA's claims" (docket no. 75) is **DENIED**;

Merit Energy's motion for summary judgment (docket no. 77) is **GRANTED** as to Count I (breach of fiduciary duty), **GRANTED** as to Count V (breach of plan of unitization), **GRANTED** to the extent it requests the Court to apply a three year statute of limitations on Count VI (conversion), and **DENIED** in all other respects; and,

PCA's Count VII (unjust enrichment) is **DISMISSED** for want of equity.

An order consistent with this opinion shall be issued forthwith.


Dated:  July 28, 2015                           /s/ Hugh W. Brenneman, Jr.
                                                HUGH W. BRENNEMAN, JR.
                                                United States Magistrate Judge